**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Woolsey, | No. CV-18-00578-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Aetna Life Insurance Company, | |
| Defendant. | |

Pending before the Court is Plaintiff's Opening Brief and Motion for Summary Judgment and Motion to Supplement the Record. (Doc. 73, "Mot.") Defendant Aetna Life Insurance Company (hereinafter "Aetna") responded, (Doc. 81, "Resp.") and Plaintiff replied, (Doc. 82, "Reply"). The Court held oral argument on February 24, 2020 and enters the following Order:

## I.    BACKGROUND

This case concerns a rejected claim for long-term disability ("LTD") benefits. Plaintiff and claimant, Michael Woolsey worked as a financial advisor for UBS Financial Services until he claimed short-term disability ("STD") benefits on January 6, 2016, citing debilitating migraine headaches and related depression. (Doc. 71-5, "Woolsey Decl." at 4-5.)   Based on the representations of his primary care provider, Physician Assistant Benjamin E. Kuhlman, Aetna awarded benefits on a rolling basis contingent on Mr. Kuhlman's (or other medical  professionals) regular updates.  (Doc. 46-3 at 310.)  Mr. Kuhlman's observations largely reflected Plaintiff's self-reported symptoms. Recognizing

Plaintiff's migraines and depression required specialist care, Kuhlman referred Plaintiff to a neurologist and psychiatrist. (Doc. 46-3 at 284, 289.) In the meantime, Mr. Kuhlman continued to update Aetna and Aetna continued to award STD benefits. Treatment for Plaintiff's allegedly debilitating condition, however, was far less regular. In fact, Plaintiff hardly received treatment at all. In six months of receiving STD benefits, Plaintiff successfully attended only one specialist appointment—an initial psychiatric consultation—for his claimed disabilities. After a final extension through June 6, 2016, Aetna found "disability not supported" and terminated Plaintiff's STD benefits. (*Id.* at 376-77.) Aetna also denied Plaintiff's subsequent application for LTD benefits. [1] (Doc. 46-2 at 316.) Following STD termination, Plaintiff's medical record grew as he sought and received treatment for his disabling conditions in earnest. Even considering the more developed medical record, Aetna upheld the LTD claim denial on appeal. (Doc. 46-3 at 2.) Plaintiff now brings this challenge.

### a. The Plan

Plaintiff is a covered beneficiary under Aetna's Long-Term Disability Plan (the "Plan"). (Doc. 46-2 at 8.) The Plan extends LTD benefits for claimants who experience qualifying injury, illness, or disabling pregnancy-related conditions. (Doc. 46-2 at 7.) Aetna decides individual claims, funds disability awards, and holds sole authority to interpret the Plan. (Doc. 46-6 at 81.) Plan eligibility requires an individual be (1) covered at the time disability began, (2) under the regular care of a physician[2] for the disabling

---

[1] Claims under the UBS self-funded STD group plan are administered by Aetna (Doc. 46-3 at 275.) Aetna approved Plaintiff's STD benefits in stages, awarding benefits first from January 6 through March 13, 2016. (Doc. 46-3 at 342.) Aetna later extended benefits three times—through April 6, 2016, then May 8, 2016, and eventually through June 6, 2016—on submission of Attending Physician Statements by Mr. Kuhlman, Plaintiff's primary care provider. (*Id.* at 350, 360, 368.).

[2] The Plan defines physician as "an M.D. or D.O. degree," who "provides medical services . . . within the scope of his or her license or certificate," and "[i]s properly licensed or certified to provide medical care under the laws of the jurisdiction where he or she practices." (Doc. 46-4 at 25.) As a physician's assistant, the regular care of Plaintiff's primary care provider, Mr. Kuhlman, may not satisfy the Plan requirements. (*See* Doc. 46-2 at 8.) This is certainly the case regarding Plaintiff's psychiatric care. When evaluating a LTD claim based on disabling mental health conditions, the plan requires a claimant be attended "by a physician who . . . specializes in psychiatry." (Doc. 46-4 at 24.) No evidence supports Mr. Kuhlman's psychiatric expertise.

illness or injury, and (3) actually disabled by the illness as determined Aetna's "Test of Disability." (Doc. 46-2 at 8.) A covered member meets this Test of Disability when they "cannot perform the material duties of [their] own occupation solely because of an illness, injury or disabling pregnancy-related condition. (Doc. 46-4 at 9.) Once a member satisfies the Test for Disability, Aetna pays out benefits monthly based on pre-disability earnings up to a maximum amount (set by schedule). (*Id.* at 9.) Relevant here, Aetna defines "material duties" as duties "normally required for the performance of [a member's] **own occupation**" that "cannot be reasonably omitted or modified." (*Id.* at 25 (emphasis in original)). A LTD benefits award is limited to a twenty-four month period when addressing disabilities "primarily caused by . . . mental health or psychiatric condition[s] including physical manifestations of these conditions, but excluding conditions with demonstrable, structural brain damage; or Alcohol [sic] and/or drug abuse." (*Id.* at 10.) To qualify for LTD benefits, a claimant "must give proof the nature and extent of the loss." (*Id.* at 20.) Benefits cease when a claimant fails to provide requested proof that he meets the LTD Test of Disability. (*Id.* at 9.)

### a. Plaintiff's Medical Condition: STD Benefits Period

From January 6, 2016, when Aetna first awarded benefits, (Doc. 46-3 at 296), to June 6, 2016, when Aetna terminated benefits, (*id.* at 376-77) Plaintiff suffered from a variety of maladies ranging from physical injury (shoulder, back, and chest[3]) a diagnosis for prostate cancer for which he was successfully treated. (Doc. 46-2 at 235.) Plaintiff's STD benefits claim, however, primarily rested on complaints of debilitating migraine headaches and depression.[4] (Doc. 46-3 at 229, 284.) Broadly, Plaintiff's treatment (sought and received) falls into three categories—general medical care from his primary care provider Mr. Kuhlman, specialist care for prostate cancer, and specialist care for migraines and depression. Plaintiff often saw Mr. Kuhlman during his STD period and regularly received care to treat his recently diagnosed prostate cancer. (*See* Doc. 46-2 at 194.) But

_____

[3] These injuries were either minor, chronic issues or successfully treated; none support Plaintiff's LTD claim. (*See* Doc. 46-3 at 238 (chest injury), 243 (shoulder), 258 (back).)
[4] Plaintiff's depression and chronic migraines are the consistent focus of his disability claims and, accordingly, of this Order.

the record is nearly bereft of specialized care to diagnose or treat his migraines and depression. What care he did receive primarily came from Mr. Kuhlman, who, himself, recognized that proper diagnosis and treatment of Plaintiff's conditions required specialist attention.

### i. Treatment from Mr. Kuhlman

Plaintiff's migraine complaints first emerge from Kuhlman's notes of a December 15, 2015 appointment. (Doc. 46-3 at 273.) Although he apparently suffered from migraines since his teenage years, Plaintiff correlated their newfound intensity and increasing frequency to professional stress and changes in the weather.[5] (*Id.* at 274.) Noting the sensitivity to (apparently cold) weather, Mr. Kuhlman recommended Plaintiff remain in Arizona rather than return to Minnesota as his UBS supervisors' desired. (*Id.*) Mr. Kuhlman prescribed amitriptyline[6] and Percocet to treat the migraines. (*Id.*) Although Percocet assisted with acute symptoms, Plaintiff's migraines continued. (Doc. 71-5 at 12.) During a January 13, 2016 appointment with Kuhlman, Plaintiff reported "at least 19 migraine headaches" within the previous four weeks. (Doc. 46-3 at 235.) The migraines were "debilitating." (*Id.*) "[L]ight and sound sensitivity" made daytime mental functioning "almost impossible." (*Id.*) Plaintiff reported the incidents from memory. (Doc. 82, Exh. A ¶ 2, "Woolsey Decl.") No clinical findings or documentation substantiate Plaintiff's reports.[7] (Doc. 46-3 at 235.) Mr. Kuhlman also noted previous, failed treatments. (*Id.*) And despite Plaintiff's earlier refusal to consult a neurologist, Plaintiff now changed his tune and expressed openness to the idea. (*Id.*) Accordingly, Kuhlman determined Plaintiff needed to "see our Neuro Headache Division . . . ASAP." (*Id.* at 237.)

---

[5] Interestingly, Mr. Kuhlman noted that previously, "in other climates" Plaintiff's migraines were "even worse" than those now supporting his disability claim. (Doc. 46-3 at 235.) How, or if, Plaintiff could work during earlier periods characterized by more severe migraines is unexplained. It is also unclear when Plaintiff's migraines became debilitating, or even the primary justification for his disability claims. To justify further STD benefits on March 2, 2016, Mr. Kuhlman "consider[ed] depression as [the] primary disabling factor at this time." (Doc. 46-3 at 230; *see also id.* at 259 ("At this point we are focusing more in on his history of depression, anxiety, and alcohol overuse/abuse as this is first and foremost going to be important for him to get under control.")).

[6] Citing problematic side-effects, Mr. Kuhlman eventually ceased prescribing amitriptyline. (Doc. 46-3 at 235.)

[7] A 2014 MRI of Plaintiff's brain revealing "no acute findings." (Doc. 46-3 at 235.)

As with Plaintiff's migraines, Mr. Kuhlman based his assessment of Plaintiff's depression on self-reported symptoms. (*Id.*) Noting signs of severe depressions and suicidal ideation, Mr. Kuhlman prescribed Cymbalta and Xanax, and requested an "urgent psychiatry consultation." (*Id.*) Mr. Kuhlman treatment of Plaintiff continued—in similar manner and with similar effect—throughout the disability period. (*See e.g.,* Doc. 46-2 at 146, 194-96; Doc. 46-3 at 201, 235-36, 284, 289.)

### ii. (A Lack of) Care from Medical Specialists

Plaintiff received an initial psychiatric consultation with Dr. Thomas Nelson, Ph.D., Psychiatry, on February 26, 2016. (Doc. 46-3 243-46.) Dr. Nelson's report summarizes Plaintiff's self-reported symptoms and Mr. Kuhlman's prior documentation and treatment records.[8] (Doc. 46-3 at 243-44.) Dr. Nelson's clinical assessment of Plaintiff's conditions is mixed. On one hand, he noted Plaintiff's low libido, poor mood, depressed motivation and weight loss—problems that partially stemmed from Plaintiff's recent prostate cancer diagnosis. (*Id.*) Plaintiff reported some thoughts of suicide but lacked clear planning or "imminent intent." (*Id.*) On the other hand, Dr. Nelson's evaluation of Plaintiff's mental status did not entirely substantiate his complaints of "severe" depression. (*Id.* at 245.) Rather, Plaintiff appeared "alert, cooperative . . . no abnormal movements. No tearfulness or lability. No disorder of thought form or content. He appeared to constitute a minimal imminent suicide risk and no clear aggression risk." (*Id.*) Dr. Nelson emphasized the "consultative nature" of the appointment, outlined various treatment options, and increased Plaintiff's antidepressant dosage. (*Id.*) Following this consultation, Plaintiff reported to Mr. Kuhlman that he would continue psychiatric care, as Dr. Nelson suggested, with Ms. Diane Cox of Strategic Health Medicine on April 12, 2016. (Doc. 46-3 at 103, 201.) Neither that appointment or any other specialized care occurred before denial of LTD benefits.[9]

---

[8] Dr. Nelson's observations are somewhat consistent with Plaintiff's previous reported symptoms—Plaintiff reported thirty-two migraines over a two-month period, and some thoughts of suicide, but no "clear planning" or "imminent intent." (Doc. 46-3 at 244.)
[9] Although Plaintiff denies "anyone asking or recommending that I treat with Diane Cox," Mr. Kuhlman, in an April 6, 2016 letter updating Aetna on Plaintiff's treatment progress, attested that Plaintiff set an appointment with Ms. Cox for April 12. (Doc. 46-3 at 201.)

Plaintiff was far more successful receiving treatment for prostate cancer and various physical injuries during the duration of STD. (*See e.g.,* Doc. 46-3 at 204-07, 217-19, 249, 251-52.) While receiving this treatment, Plaintiff often reported his continued struggles with depression and migraines. (Doc. 46-3 at 195.) Mr. Kuhlman considered Plaintiff's bout of prostate cancer likely to augment his "ongoing major depression." (Doc. 46-3 at 201.) But outside of his initial psychiatric consultation and these occasional reports of migraine or depression symptoms to medical professionals treating Plaintiff for other conditions, Mr. Kuhlman remained Plaintiff's solitary source of treatment and diagnosis for his disabling migraines and ongoing depression. During this time, Mr. Kuhlman continued to report to Aetna that Plaintiff's migraines and depression rendered him severely disabled and unable to work. Just as consistently, but without apparent success, he urged Plaintiff to seek care from relevant specialists.[10] (Doc. 46-2 at 146, 194-96; Doc. 46-3 at 201, 235-36, 284, 289.)

### b. STD Benefits Terminated, LTD Claim Denied

Aetna extended benefits a final time through June 6, 2016, (Doc. 46-3 at 368), before finding Plaintiff's disability unsupported and terminating his STD benefits one month before his eligibility expired. (*Id.* at 376-77.) Aetna based the STD termination on a review of Mr. Kuhlman's records and advised Plaintiff to submit specific findings to substantiate his claims on appeal. (*Id.*) Aetna proceeded to deny Plaintiff's LTD claim on July 1, 2016. (Doc. 46-2 at 316.) The LTD denial letter outlined the relevant policy provisions, summarized Plaintiff's medical records, and provided both general and specific guidance for how to perfect his claim on appeal. (*See id.*) Aetna had previously communicated that a LTD claim denial was possible. (Doc. 46-2 at 255.) Prior to his loss of STD benefits, Aetna notified Plaintiff that his LTD claim was under review and specified that "[c]ertification of your short-term disability benefits does not guarantee payment of LTD benefits." (Doc. 46-2 at 255, 273.) Plaintiff appealed the denial. (Doc. 46-2 at 189-92.)

---

[10] On this point, Mr. Kuhlman was clear: "it is imperative that we have [Plaintiff] see our Psychiatry Division as he will need a lot of direction in care over the next six months from this standpoint." (Doc. 46-3 at 236.)

### c. Appeal from LTD Denial

In the months following his LTD claim denial, the amount of medical treatment for Plaintiff's disabling conditions far exceeded that received during his six months on STD. Plaintiff's first neurological treatment was an August 29th consultation with Dr. Sanford Fineman, M.D.[11]  (*See* Doc. 46-2 at 185.)  He followed up with Dr. Fineman once.  (Doc. 46-2 at 185-86 (documenting an October 19, 2016 appointment).)  Dr. Fineman noted that Plaintiff "clearly remains unable to work because of his frequent headaches" and "continues to clearly remain disabled."  (Doc. 46-2 at 186.)  However, Dr. Fineman's neurological exam findings characterized Plaintiff as generally "alert cooperative pleasant patient in no acute distress although he appears depressed."  (*Id.*)  Plaintiff appeared cognitively intact, with no structural nerve damage, and only "a very mild tremor on finger-nose-finger" examination. (*Id.*)  Plaintiff's mental health treatment resumed at an October intake appointment with Dr. Noel Kilgarriff, Psy.D.. (Doc. 46-2 at 142.) Dr. Kilgarriff treated Plaintiff four times.  (*Id.* at 140-42 (documenting treatment sessions on Oct. 18, Nov. 8, 15, Nov. 22)). Kilgarriff's notes reveal Plaintiff's consistent reports of depression, difficulties accomplishing some tasks of daily life, and struggle with suicidal ideation.  (*Id.*)  Aetna regularly communicated with Plaintiff as his appeal progressed.  Such communication was necessary[12] given that nearly all the relevant medical records supporting Plaintiff's claimed disability relate to Plaintiff's medical treatment post-LTD denial.  In fact, Aetna extended the appeals decision deadline multiple times to accommodate Plaintiff's further submissions. (*See e.g.,* Doc. 46-2 at 325-36, 327, 337, 343.)

Aetna eventually assigned the appeal to Reliable Review Services ("RRS"), a third-party vendor contracted to conduct independent peer-to-peer reviews of Aetna claims.

---

[11] Aetna never received or reviewed Dr. Fineman's August 29, 2016 initial consultation notes. (Resp. at 10 n.6.)

[12] At one point, Plaintiff withdrew his LTD appeal and attempted return to work. (Doc. 46-2 at 69.)  That attempt failed when UBS's physician, Dr. Orsher, would not allow Plaintiff to resume employment.  (Doc. 46-2 at 164; *see also id.* at 145 ("Dr. Orsher (UBS) will not be willing to clear him from their standpoint unless psychiatry and neurology feel he is able to function in regards to his position.").)  It is unclear if Dr. Orsher ever personally examined Plaintiff.

(Mot. at 2; *see also* Doc. 71-8 at 1-39.) RRS selected Dr. Joseph Rea, M.D., to review from an occupational medicine perspective and a psychologist, and Dr. David Nowell, Ph.D., to review Plaintiff's mental health complaints. (*Id.*) The two physicians reviewed the available medical records, reached out to Plaintiff's attending physicians, and assessed Plaintiff's appeal.[13] Both determined the record insufficient to support significant impairment. Based on the independent reviews' findings that no basis existed supporting Plaintiff's functional limitations, Aetna denied Plaintiff's appeal on December 15, 2016, upholding its July 1, 2016 LTD benefits denial. (Doc. 46-3 at 2.) The appeal acknowledged Plaintiff's medical complaints but determined a lack of "clinical correlation for any specific restrictions preventing . . . working are not supported." (*Id.*) The appeals decision reviewed six occasions Plaintiff received treatment from medical professionals, summarized the findings of two doctors' independent reviews of Plaintiff's medical record, and outlined Plaintiff's legal rights moving forward. (*Id.*)[14]

## II. LEGAL STANDARD

The Employment Retirement Income Security Act ("ERISA") "governs the administration of employer-provided benefit pension plans." *Metro. Life. Ins. v. Parker*, 436 F.3d 1109, 1111 (9th Cir. 2006). ERISA requires plan administrators, as fiduciaries, to administer their plans "in accordance with the documents and instruments governing the plan insofar as the documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

Courts review the denial of ERISA benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan "unambiguously provide[s] discretion to the administrator", the

---

[13] Aetna updated Plaintiff on the status of the independent reviews, contacted his attending physicians, and enlisted Plaintiff to solve communication issues. (*See* Doc. 46-2 at 343; Doc. 46-3 at 1.)

[14] Specifically, the appeals decision letter cited three appointments with Mr. Kuhlman— on January 13, February 9, and June 7 of 2016—a February 26, 2016 appointment with a psychiatrist, Dr. Thomas Nelson, an October 19, 2016 evaluation with neurologist, Dr. Sanford Fineman, and an October 21, 2016 Attending Provider Statement from Dr. Noel Kilgarriff. (Doc. 46-3 at 2.)

standard of review shifts from the default, de novo, to abuse of discretion. *Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (9th Cir. 1989); *see also, Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110-11 (2008). "Under the abuse of discretion standard of review, 'the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091,1096 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 512 (2010)). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan or rely on clearly erroneous findings of fact." *Day*, 698 F.3d at 1096. Under the abuse of discretion standard, a court considers "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hickson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).[15]

A reviewing court should weigh any conflict of interest or procedural irregularity as a factor in its review. *Glenn*, 554 U.S. at 108. When "the entity that administers the plan . . . both determines whether ran employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created. *Id.* "A conflict of interest is a factor in the abuse-of-discretion review, the weight of which depends on the severity of the conflict." *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 900 (9th Cir. 2016). Even in the face of a conflict, "a deferential standard of review remains appropriate." This does not mean that plan administrators automatically prevail on the merits, only that a plan administrator's interpretation of the plan "will not disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (citation and quotation omitted). Similarly, "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said

---

[15] In an ERISA benefits case, the traditional summary judgment standards are not necessarily appropriate. Fed. R. Civ. P. 56. When, as here, a plan administrator's determination is reviewed for abuse of discretion, "a motion for summary judgment is merely a conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material facts exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted." *Abatie*, 458 F.3d at 972. Alternatively, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal quotation marks and citations omitted). But "deference" is not a "talismanic word that can avoid the process of judgment." *Salomaa*, 642 F.3d at 673 (quoting *Glenn*, 554 U.S. at 118). "The nature and scope of the alleged violations will significantly affect the standard of review applied by the district court." *Hoffman v. Screen Actors Guild Prod. Pension Plan*, 757 Fed. Appx. 602, 604 (9th Cir. 2019).

A reviewing court should also consider procedural errors in deciding whether a plan administrator abused its discretion. *See Salomaa*, 642 F.3d at 674. Among other procedural irregularities, inconsistent reasons for denial and evidence of malice are rightly considered. *Id.* "A small procedural irregularity is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion, just as a court would weigh a conflict of interest." *Horton v. Phoenix Fuels, Co., Inc.*, 611 F.Supp.2d 977, 986 (D. Ariz. 2009). "Procedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 985 (9th Cir. 2005).

## III. DISCUSSION

### a. Conflict of Interest and Standard of Review

The Plan unambiguously confers discretionary authority to Aetna as administrator. (Doc. 46-6 at 81 (granting Aetna "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein."); *see also Abatie*, 458 F.3d at 963 (finding abuse of discretion the proper standard of review when an "ERISA plan unambiguously grant[s] discretion to the administrator.").

Both parties agree that the abuse of discretion standard applies to this Court's review of Aetna's conduct. (Mot. at 3; Resp. at 2.) Both likewise agree that Aetna, by funding and administering the Plan, has a structural conflict of interest. (Mot. at 2-3; Resp. at 2, 17.) They disagree as to what weight, if any, this Court should accord that conflict.

Aetna acknowledges the conflict of interest may require the Court's review with additional skepticism. (Resp. at 17-18.) Although nothing establishes Aetna's conflict of interest affected the review of Plaintiff's claims here, the lack direct evidence that a conflict affected the claims process is unsurprising in ERISA cases. *Salomaa*, 642 F.3d at 676 (determining that because the administrative record usually does not disclose direct evidence of an insurance company's conflict—like claims-handling history in other cases or internal directives to claims managers in how to evaluate claims—"we are ordinarily ignorant of much of what we are supposed to weigh."). In ERISA cases, courts do not require direct evidence a conflict of interest manifestly affected the outcome of a case. [16] *Id.* Rather, conflicts of interest justify a court's "additional skepticism" because of the unique incentives of ERISA's statutory scheme. *Id.* Regardless of whether Plaintiff proves the conflict of interest affected Aetna's decision-making (here, he does not), the incentives inherent in ERISA cases remain unchanged and require a court review with some additional skepticism. *See Demer*, 835 F.3d at 903 ("[T]he lack of such specific evidence does not mean that there is *no* conflict of interest.") (emphasis in original). The question remains: how much?

Plaintiff asks the Court to accord greater weight to Aetna's conflict of interest above the "higher degree of skepticism" normally applied in such cases, while Aetna believes the conflict of interest deserves little weight. (Resp. at 17-18.) Plaintiff first assumes that Aetna denied Plaintiff's LTD benefits for financial reasons, then concludes Aetna administrators abrogated their fiduciary duties under ERISA. [17] (Mot. at 3.) As discussed

---

[16] Although a plan administrator should be granted "broad deference notwithstanding a minor irregularity" when "an administrator can show it has engaged in an ongoing, good faith exchange of information [with] the claimant," the Court finds no case that willfully ignores an *actual* conflict of interest merely because the administrator *appears* to have operated in good faith. *See Abatie*, 458 F.3d at 972.

[17] Plaintiff's argument that heightened scrutiny is warranted from Aetna's failure to show

below, Plaintiff's assumptive argument fails for two primary reasons.

First, concerning Aetna's alleged violation of fiduciary duties, Plaintiff views the deposition testimony of two Aetna employees as dispositive. (Mot. at 3.) Plaintiff strangely focuses on the deponents' inability to cite controlling Ninth Circuit precedent as proof they disregarded fiduciary obligations. (Doc. 71-1 at 135.) Of course, Aetna, as a plan administrator, is bound by ERISA's mandates. *Firestone*, 489 U.S. at 115. That Aetna must comply with the relevant legal precedent interpreting ERISA does not establish that Aetna claims managers must be familiar with or able to cite controlling Ninth Circuit precedent on demand. Plaintiff certainly cites no case saying so.

Second, aside from basic money-saving incentives inherent in any business, Plaintiff points to no credible evidence that financial incentives influenced the claims process here. He makes two specific arguments on this point. He first contends that Aetna's financial motive to deny his LTD claim is the only possible explanation for Aetna's STD approval and LTD benefits denial. Because "nothing [in his medical record] had changed" and the standard for review of LTD and STD benefits is largely the same, denial of his LTD claim *must* be pretextual. (*See* Mot. at 11.) This argument improperly assumes his medical records, in fact, support approval of his LTD claim.[18] But Aetna's initial LTD benefits denial is on solid ground. As previously discussed, Plaintiff hardly sought or received any specialist treatment for either migraines or depression before his LTD claim denial. This is particularly relevant where Plaintiff's attending physician determines specialist treatment is necessary and defers to the treatment advice from such specialists. What's more, both Aetna and Mr. Kuhlman notified Plaintiff that a LTD benefits award did not follow automatically from a STD claim approval. (Doc. 46-2 at 255 (Aetna); Doc. 46-2 at 195-96 (Kuhlman).) Plaintiff next cites *Holzschuh v. UNUM Life Ins. Co. of Am.*, No. CIV.A. 02-1035, 2002 WL 1609983, at *7 (E.D. Penn. July 18, 2002), to take issue

---

"*credible* evidence" of mitigation is unavailing and misconstrues *Abatie*. (Mot. at 25.)

[18] While an award of STD benefits immediately followed by denial of LTD benefits *may*, in some instances, indicate an operative conflict of interest, Plaintiff's argument completely ignores the substantive merits of the disability claim itself. Under Plaintiff's approach, an administrator who leniently grants STD benefits would be unable to deny LTD benefits regardless of whether the record supports a benefits award.

with Aetna's use of a clinical social worker to review his LTD claim, arguing that "[g]iven [Plaintiff's] psychological diagnoses" Aetna's failure to employ a "health care specialist such as a psychologist or psychiatrist" supports a violation of fiduciary duties. (Mot. at 11-12.) The *Holzchuh* court questioned a plan administrator's use of "nurses and non-treating/examining physicians" to deny a LTD claim supported by clinical findings *after* sustaining that claim for over a year. *Holzschuh*, 2002 WL 1609983, at *7. Here, Aetna denied an initial LTD claim due in part to a lack of clinical findings. In short, Aetna's use of clinical social worker to review Plaintiff's initial LTD claim does not support an operative conflict of interest.

Finding Plaintiff's arguments here unpersuasive, the Court reviews Aetna's conduct under the deferential abuse of discretion standard, but only with a modicum of additional skepticism required by Aetna's structural conflict of interest.

### b. Procedural Irregularities and Supplementation of the Record

With Aetna's conflict of interest established, the Court weighs the significance of any procedural irregularity. Like a conflict of interest, procedural irregularities can "reduce[] the deference owed to an administrator's decision to deny benefits" and heighten judicial scrutiny. *Abatie*, 458 F.3d at 972 (citing *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004)). "A more serious procedural irregularity may weigh more heavily." *Id.* As discussed below, the record does not suggest "wholesale and flagrant violations of the procedural requirements of ERISA" that necessitate de novo review. *Id.* at 971. Some procedural irregularities Plaintiff identifies were largely inconsequential. *See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) (delineating between innocuous procedural violations where "[o]rdinarily, a claimant . . . is entitled to no substantive remedy" and those that "result in substantive harm" where "a court must consider . . . whether the decision to deny benefits in a particular case was arbitrary and capricious") (citation and internal quotation marks omitted). That said, the cumulative effect of procedural irregularities here "prevented a full development of the administrative record" and warrant

granting Plaintiff's motion to supplement. *Abatie*, 458 F.3d at 973.

Plaintiff classifies a slew of Aetna's actions as procedural violations. The Court addresses each possible procedural irregularity in turn, then reviews their cumulative effect.

### i. Justification for Plaintiff's Claim Denial

Plaintiff first claims that the denial of LD benefits was illogical, implausible and unlawful. Plaintiff sees the denial of his LTD claim as directly at odds with the medical records. (Mot. at 14.) For Aetna, the record speaks for itself.[19] Aetna's faith in the record is not entirely misplaced. The record supports Aetna's initial denial far more than Plaintiff admits. Outside of his single psychiatric consultation, nearly all evidence of Plaintiff's depression and migraines came from Mr. Kuhlman's documentation of Plaintiff's self-reported symptoms.[20] (*See* Doc. 46-3 at 197, 205, 229.) As mentioned previously, a LTD claim based in any part on mental health or psychiatric issues like Plaintiff's depression here requires a treatment "by a physician who . . . specializes in psychiatry." (Doc. 46-4 at 24.) By the Plan's plain language, Mr. Kuhlman's observations and treatment of Plaintiff's depression carry far less weight than Plaintiff believes. (*See id.*) Plaintiff downplays the significance of the above and chalks up the delay in receiving specialized psychiatric or neurological care to mere scheduling difficulties.[21] Regardless of the reasons

---

[19] Plaintiff repeatedly takes offense to Aetna's challenging the credibility of his claims. (*See* Reply at 7-8.) The Court looks to the record in making credibility determinations. *Abatie*, 458 F.3d at 969; *see also Jebian*, 349 F.3d at 1104 ("[A]n agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale by counsel.") (citation and internal quotation marks omitted).

[20] Other medical professionals also noted his complaints during Plaintiff's prostate cancer treatment. (Doc. 46-3 at 538 (radiologist notes)).

[21] Plaintiff concludes that follow-up care following his initial psychiatric consult with Dr. Nelson was purely voluntary. He characterizes Dr. Nelson's treatment in narrow terms as "only for an evaluation of depression," and infers that Mr. Kuhlman's continued treatment was satisfactory. (Reply at 15.) Kuhlman himself explicitly contradicts this representation by deferring to Dr. Nelson's judgment and treatment plan following Plaintiff's initial consultation. (Doc. 46-3 at 239.) Plaintiff does not explain this disconnect. Regardless, assuming Dr. Nelson's offer of treatment was optional and to be conducted "if [Plaintiff] were wanting ongoing psychotropic management" undercuts, rather than supports, the severity of Plaintiff's depression. (Doc. 46-3 at 246.) What's more, Dr. Nelson's report itself hardly supports a disabling depressive condition. Interpreted in a light most favorable to Plaintiff's arguments, the report details a single, severe depressive episode suffered by an otherwise capable individual. (*See id.* at 243-46.)

for delay, the medical record prior to LTD benefits denial is shockingly thin. That Plaintiff told Mr. Kuhlman in May that, barring complications from his prostate cancer treatment, he would resume work at UBS only reinforces the impression that Aetna's LTD denial was justified. (Doc. 46-2 at 197-198.) Ultimately, the lack of specialized care confirms that the initial denial of LTD benefits was not illogical, implausible or unlawful.

Plaintiff includes multiple citations to *Wilson v. John C. Lincoln Health Network Group Dis. Plan*, No. CV-04-1373-PHX-NVW, 2006 WL 798703 (D. Ariz. March 28, 2006) to support several separate propositions.[22] *Wilson* is not on point. Unlike here, the plan administrator in *Wilson* denied a claim despite a robust medical record that documented years of treatment by specialists for a claimant's subjective reports of pain. *See Wilson*, 2006 WL 798703, at *2. The *Wilson* medical record included narrative letters and medical records from five physicians and one physical therapist, multiple functional capacity evaluations, and a vocational expert assessment. *Id.* By comparison, when Aetna initially denied the LTD claim here, Plaintiff had only attended a single, initial consultation with a specialist that addressed only one of Plaintiff's allegedly disabling conditions. Admittedly, Mr. Kuhlman consistently documented Plaintiff's reported migraine symptoms and depression, but he just as consistently deferred to specialists for Plaintiff's diagnosis and treatment of those conditions. (*See* Doc. 46-3 at 239.) Rather than discrediting Plaintiff's subjective complaints (or Mr. Kuhlman's consistent reports of those complaints), Aetna explicitly considered them, but remained concerned by the lack of attempted treatment. (Doc. 46-2 at 316 ("You initially went out of work due to a diagnosis of migraine headaches and became depressed following up with a psychologist once but following your diagnosis with cancer you did not continue therapy.").)

Aetna denied Plaintiff's claim, in part, due to a lack of "objective clinical examination findings to support subjective symptoms." (Doc. 46-2 at 39.) Aetna's desire for "objective clinical findings" was not a surprise requirement sprung on Plaintiff for the

---

[22] Namely, Plaintiff believes *Wilson* supports finding an abuse of discretion due to Aetna's failure to order an Independent Medical Examination ("IME"), Aetna's improper requirement for "examination findings," and the alleged selective review by RRS physicians. (Mot. at 14, 17, 23.)

first time in his initial LTD claim denial. Plaintiff's focus Aetna's use of the word "objective" misses the bigger picture here. First, the Plan itself supports Aetna's position. The Plan grants Aetna the sole authority to both interpret the Plan and decide claims. ((Doc. 46-6 at 81)); *see also Salomaa*, 642 F.3d at 675 ("What deference means is that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'") (quoting *Conkright*, 559 U.S. at 506, 130 S.Ct. 1640). No, the Plan does not include the word "objective" or expressly require "clinical findings." (*See generally* Doc. 46-4.) It does, however, include language that supports the reasonableness of Aetna's requests. Namely, eligibility for LTD benefits under the Plan requires "[a]n illness; [a]n injury; or [a] disabling pregnancy-related condition." (Doc. 46-4 at 8.) The Plan defines "illness" as a "pathological condition of the body that presents a group of *clinical signs* and symptoms and *laboratory findings* peculiar to it . . . ." (*Id.* at 24 (emphasis added).) The Plan's plain language thus supports some requirement for objective clinical findings and places Plaintiff on notice Aetna may request such findings. (*See id.*) It is difficult to read the Plan otherwise. If that wasn't enough, Aetna communicated its need for clinical findings regularly.[23] (*Contra* Reply at 10-12.) Aetna requested "measurable, quantifiable findings by physical examination or diagnostic testing" when evaluating Plaintiff's STD benefits for continued approval, (*see* Doc. 46-3 at 61 (February 25, 2016 email), 96 (April 6, 2016 email)), before laying this out with some additional detail in denying LTD benefits. (Doc. 46-2 at 316.) Finally, Aetna's request for clinical findings does not read as a determinative requirement, but instead as one factor Aetna considered in denying Plaintiff's claim. (*See* Doc. 46-2 at 125 (finding the lack of evaluations from medical specialists "as well as objective clinical findings" made ascertaining Plaintiff's level of disability difficult).)

Plaintiff believes Aetna discredited his subjective complaints.[24] (Mot. at 30; Reply at 9-10.) Citing *Khan v. Provident Life and Accident Ins. Co.*, 386 F.Supp.3d 251

---

[23] Whether the content of this communication met ERISA requirements is questionable. *See infra* at 22-23.

[24] Specifically, he complains that "in rejecting and not crediting *any* of [Plaintiff's] subjective complaints or his reliable evidence, Aetna and its reviewers proffer a more subtle, insidious and adversarial position—Mr. Woolsey is lying, cheating, and faking." (Mot. at 30.)

(W.D.N.Y. 2019), he argues that "Drs. Nowell and Rea were not in a position to adequately or fairly evaluate Mr. Woolsey's subjective complaints and credibility from across the country in Massachusetts and Texas." (Mot. at 30.) *Khan* is distinguishable. The *Khan* administrator's claim denial "stood or fell on the credibility of [the plaintiff's] subjective complaints. 386 F.Supp.3d at 269-72. That is not the case here. Aetna's denial cites observational evidence inconsistent with Plaintiff's subjective reports. Lacking objective clinical findings entirely, Aetna had little evidence that possibly justified claim approval. Indeed, contrary to both the plan administrator in *Khan* and Plaintiff's representations, Aetna explicitly credited Plaintiff's subjective disabling complaints. (*Compare* Reply at 10 ("Aetna failed to consider Mr. Woolsey's disabling subjective complaints") *with* Doc. 46-3 at 2 ("While we do not deny that you may be experiencing some complications from your physical and nervous conditions, we need to determine[] if they rise to the level of severity which[] prevented you from performing the material duties of your own occupation as Financial Advisor.")). Aetna's denial stems from Plaintiff's failure to seek care for the disabling conditions afflicting him. (*See* Doc. 46-2 at 317 ("Without clinical findings to support attention issues, migraine headaches, depression, anxiety as well as the impact these diagnoses have on [y]our cognition we are unable to determine your level of impairment.")). An administrator is not bound to meekly approve a disability claim when the claimant makes little effort to properly diagnose and treat allegedly disabling conditions and subjective reports are unsubstantiated by clinical findings or other corroboration. While "pain is a completely subjective phenomenon," *Saffon v. Wells Fargo & Co. Long Term Dis. Plan*, 511 F.3d 1206, 1216 (9th Cir. 2008), "[a] claimant's subjective complaint of pain is *by itself* insufficient to establish disability."[25] *Taylor v. Heckler*, 765 F.2d 872, 876 (9th Cir. 1985) (emphasis added). Reports of "pain need not be corroborated by objective medical findings, but some impairment must be medically ascertained. . . ." (*Bunnell v. Sullivan*, 947 F.2d 341, 347-48 (9th Cir. 1991) (quoting *Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir. 1983)). Nevertheless, Aetna had a duty to effectively

---

[25] The rules and presumptions of Ninth Circuit Social Security case law are relevant, but not binding here. *Saffon*, 522 F.3d at 873 n.3.

communicate with Plaintiff about what was necessary in a way that could be understood and, as discussed below, they failed. *Montour*, 588 F.3d at 636.

### ii. Independent Reviewers

Plaintiff claims procedural error from Aetna's reliance on biased reviewing professionals. (Mot. at 18-20.) Plaintiff draws this inference of bias from three sources: (1) RRS's financial relationship with Aetna; (2) the failure to consider the aggregate effect of his conditions; and (3) a conclusion that the independent reviewers findings were against the weight of the evidence.

Undoubtedly, RRS (and, consequently, Drs. Nowell and Rea) is well-compensated for its services. Its share of Aetna's independent-review business increased from 2015 to 2016.[26] (*See* Mot. at 19.) The statistical evidence supports a finding common in ERISA cases—independent reviews are prone to the same conflicts of interest that afflict ERISA plan administrators. *See Demer*, 835 F.3d at 904 ("[I]t is not hard to imagine an outside medical examiner who does not engage in a neutral, independent review, such as where the examiner receives hundreds of thousands of dollars from a single source and performs hundreds of reviews for that source per year. . . .We simply apply the unremarkable proposition that the number of examinations referred and the size of the professional fees paid to a reviewer may compromise the neutrality of an expert."). The statistical evidence supports this Court's application of some additional skepticism in reviewing for Aetna's abuse of discretion. *See supra* at 9-11. But, keeping a "judicial eye . . . peeled for conflict of interest," a de novo review remains unmerited given the evidence's generalized, conclusory, and inferential nature. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 384 n.15, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002).[27]

Plaintiff admonishes the independent reviewers for not assessing the cumulative effect of his multiple disabling conditions. Neither Aetna nor the RRS physicians assigned

---

[26] Plaintiff supports these statistics with observational evidence from Aetna claims manager Mr. Douglas Burdick. (Mot. at 19.) Gen

[27] Plaintiff wants the Court to consider comments made by the owner of RRS in 2005 to infer greater bias. However, there is no evidence that the owner had any part in the review of this case and the Court ignored this attack.

to conduct an independent review of Plaintiff's claim considered the aggregate effect of his conditions. Dr. Rea reviewed the claim "from an Occupational Medicine perspective." (Doc. 46-2 at 132.) Dr. Nowell reviewed the claim "from a psychology perspective." (Doc. 46-2 at 136.) Each defers to the other on questions outside their expertise. (Doc. 46-2 at 134, 138.) Obviously, the combined effect of multiple medical conditions can be greater than any one alone. *See Nickola v. Group Life Ass., Co.*, No. 03 C 8559, 2005 WL 1910905, at *9 (N.D. Ill. Aug. 5, 2005) ("Precedent teaches that an administrator making a disability determination must make a reasoned assessment of whether the total combination of a claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion."). Although the record may not eventually support Plaintiff's disability claim, the Court finds a procedural violation in Aetna's failure to consider the possibility that the conditions' combined effect was disabling.

Lastly, Plaintiff argues the independent reviewers' opinions directly contradict the medical record and questions their expertise to review his claim. (Mot. at 21-24.) At the outset, the Court gives little credence to Plaintiff's inference that Drs. Nowell and Rea lack competence. Plaintiff points to no case to support his inference that only "[a] neurologist, like Dr. Fineman, . . . should have reviewed the claim." (Mot. at 23.) Of course, Plaintiff relies primarily on the findings of a comparatively less-qualified Physician Assistant to support his own disability claim. Whether the independent reviews directly contradict the medical record is a closer case. Plaintiff correctly point out that the independent reviews partially disagree with the conclusions of Plaintiff's attending physicians late in the appeal process. Specifically, Plaintiff argues the independent reviews impermissibly dismiss the reports of Plaintiff's neurologist, Dr. Fineman, and psychologist, Dr. Kilgarriff. (Mot. 21-24.) RRS reviewer Dr. Nowell found no restrictions from a mental perspective whatsoever. (Doc. 46-2 at 172.) While Dr. Fineman's relatively ordinary neurological exam findings seemingly support Dr. Nowell's conclusion, both independent reviewers gave short shrift to, or fail to address entirely, Dr. Fineman's observation that Plaintiff "clearly remains

unable to work." (Doc. 46-2 at 185.) This pattern repeats in their treatment of Dr. Kilgarriff's feedback. (*See id.* at 170-71.) Although the independent reviewers unquestionably considered the attending physicians' opinions, they undoubtedly accorded less weight to their conclusions. As a general matter, ERISA does not necessarily demand more. *Montour*, 588 F.3d at 635-36 ("ERISA administrators may not arbitrarily ignore a treating physician's opinion, but that opinion also is not entitled to any 'special deference.'") (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 831, 834, 123 S.Ct. 1965, 155 L.Ed. 1034 (2003)). Here, however, more was warranted. Given the record is otherwise bereft of feedback from neurological or psychiatric specialists, the Court finds the independent reviewers dismissive treatment of Dr. Kilgarriff's and Dr. Fineman's conclusions as irregular. *See* 29 C.F.R. § 2560.503-1(h)(2)(iv) (requiring plan administrators to consider documentation submitted by a claimant at the appeal stage).

### iii. Failure to Evaluate the Pharmacological Effects

Plaintiff contends that Aetna's review on appeal failed to evaluate the possibly disabling side-effects of Plaintiff's medications. Aetna was clearly aware of narcotics use. Indeed, Plaintiff primarily used Percocet to treat his acute migraine symptoms. (*See e.g.,* Doc. 46-2 at 11, 31, 55, 144, 164, 185-86, 194-95, 197-98, 206, 208-09.) But, unlike the cases Plaintiff cites,[28] the record offers little support that any narcotic side-effects Plaintiff experienced were themselves disabling.[29] The RRS independent reviews reflect this. Dr. Rea expressly considered possible pharmacological side effects and correctly noted the record has little to say about the "presence or extent" of such symptoms before concluding there was no "firm basis to deduce significant impairment."[30] (Doc. 46-2 at 131-34.)

---

[28] Neither *Nickola v. Group Life Ass., Co.*, No. 03 C 8559, 2005 WL 1910905, at *7 and *Lawrence v. Motorola, Inc.*, No. CV-04-1553-PHX-NVW, 2006 WL 2460921, at *6-7 (D. Ariz. Aug. 24, 2006) is persuasive. The cases either concern an administrator's complete failure to consider narcotic side-effects (*Lawrence*) or a claimant whose chronic narcotic use was central to his disability claims and medical treatment (*Nickola*). Here, Aetna considered pharmacological side effects largely tangential to Plaintiff's disability claim but found insufficient support to establish disability.

[29] The record occasionally indicates that Plaintiff's misuse of Percocet aggravates his condition. (Doc. 46-2 at 186.)

[30] Plaintiff makes much of Dr. Rea's use of "significant impairment." Common sense dictates that, to a reviewing physician, a lack of "significant impairment" merely means there is not enough proof to support disability.

- 20 -

Addressing Dr. Nowell's review, Plaintiff argues that "Dr. Nowell never evaluated the cognitive aspect of Mr. Woolsey's side effects," specifically those hinted at in Dr. Kilgarriff's clinical observations. (Mot. at 26.) Dr. Nowell's review rebuts this. (Doc. 46-2 at 171-73.)    The review shows Dr. Nowell was aware of Plaintiff's claim that pharmacological side-effects contributed to his disability. Dr. Nowell personally spoke with Dr. Kilgarriff and reviewed Dr. Kilgariff's clinical notes. (Doc. 46-2 at 171-73.) Dr. Kilgarriff reportedly told Dr. Nowell that narcotic side-effects were a possible concern,[31] but hardly affirmed that narcotic side-effects were currently, or had been, disabling. (*See* Doc. 71-5 at 8.)    Given that Dr. Kilgarriff's clinical notes flag, but do not explicitly comment on possible narcotic side-effects, Dr. Nowell's conclusion seems reasonable. (*See* Doc. 46-2 at 174-84.)    On this point, neither Dr. Rea's nor Dr. Nowell's conclusions constitute a procedural violation.

### iv. Vocational Assessment

Claiming "Aetna never considered [Plaintiff's] vocational issues," Plaintiff faults Aetna for failing to conduct an occupational assessment with a vocational expert. (Mot. at 28-29.) An administrator's failure to investigate vocational requirements can constitute a "significant omission." *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 678 (8th Cir. 2005). That said, ordering a vocational experts report seems unnecessary when, as here, an administrator does not find *any* functional limitations to support disability.  Thus, the significance of an omission here depends on whether Aetna is correct to conclude that no "impairment prevented [Plaintiff] from performing the material duties of his occupation."    (Resp. at 23.)    Aetna had requested and received some information concerning the nature of Plaintiff's employment. (*See* Doc. 46-2 at 20.) And, as discussed below, Aetna had sufficient information that reasonably inferred *some* possible impairment existed, but largely discredited those reports. Aetna's failure to address the requirements of Plaintiff's specific vocation, as required by the Plan's "own occupation" provision,"

---

[31] In conversation, Dr. Kilgarriff relayed his observations of Plaintiff's neurological symptoms—"slow processing speed, talking slowly"—that "might suggest some combination of behavioral side effect of pharmacotherapy and clinical depression." (*Id.* at 171.)

weighs in favor of finding a procedural irregularity here. (Doc. 46-4 at 9, 25.)

### v. Unassessed Medical Records

It is unclear whether Aetna considered some medical records at all. Specifically, clinical notes from Plaintiff's August 29, 2016 neurological appointment with Dr. Fineman are missing from the administrative record. (Doc. 71-5 at 20-22 ("Aug. 29 Dr. Fineman Appointment"); *see also* Doc. 46-3 at 2 ("Appeal Decision Letter").) Each party assigns fault for this discrepancy to the other. Finger-pointing notwithstanding, the record reveals Plaintiff's first neurological consultation was not considered in review on appeal from denial of LTD benefits. ERISA "does not require plan administrators to *seek out* evidence when making a benefit decision." *LaMarco v. CIGNA Corp.*, No. C-99-0561 MJJ, 2000 WL 1456949, at *13 (N.D. Cal. Sept. 25, 2000); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999) ("if claimant believed particular medical data should have been reviewed by the plan administrator, he should have sent it to them") (citation and internal quotation marks omitted). That said, although claimants must submit "the pertinent documents and information necessary to facilitate a disability determination, regulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing the missing information." *Montour*, 588 F.3d at 636 (citing C.F.R. § 2560.503-1(f)(3), (g)(1),(iii)). The record does not show that Plaintiff was aware that Aetna never received Dr. Fineman's initial consultation notes. Aetna, however, should have recognized the discrepancy. The August 29th appointment was internally referenced in multiple places within the disclosed medical records in Aetna's custody. Aetna's claim review thus placed them on sufficient notice the identify and request the missing information. Indeed, they were best placed to do so. Accordingly, Aetna's failure to consider the missing records weighs in favor of a procedural violation. *Cf. Roberts v. Anthem Life Ins. Co.*, No. CV 16-00571-BRO (GJSx), 2017 WL 2469354, at *6 (C.D. Cal. June 7, 2017).

**Aetna's Dialogue with Plaintiff**

Plaintiff claims a procedural violation from Aetna's inadequate communication, pointing to Aetna's failure to disclose Dr Nowell and Dr. Rea's reports. (Mot. at 27.) Plaintiff likens the violation to that in *Salomaa*, where the court held "[a] physician's evaluation provided to the plan administrator falls squarely within [ERISA's] disclosure requirement." 642 F.3d at 680. In that case, the failed disclosure of reviewing physicians' reports at an initial and final denial robbed Plaintiff of "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits." *Id.* Not as egregious as the violations in *Salomaa*, Plaintiff was denied that opportunity here, nonetheless. Aetna engaged Plaintiff in dialogue regularly, but not *meaningfully*. *Cf. Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (determining that what ERISA, "[i]n simple English . . . calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries" such that "if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it"). During Plaintiff's stint on STD, Aetna touched based with Plaintiff or Mr. Kuhlman every month. (Doc. 46-3 at 310, 315, 317, 334, 342, 350, 360, 368; Mot. at 11.) As expiration of his STD benefits approached, Aetna prepared Plaintiff for his upcoming LTD claim by explaining the process, setting expectations, and outlining additional information Plaintiff should submit. (Doc. 46-2 at 255.) Upon denying benefits, Aetna also explained the reasons for denial and outlined how Plaintiff could perfect his claim on appeal. (Doc. 46-2 at 316.) But this generalized guidance did not clearly inform Plaintiff why the information he had already provided—like the six months of reports from Mr. Kuhlman— was insufficient. *See Mason v. Federal Express Corp.*, 165 F.Supp.3d 832, 853-54 (D. Alaska, 2016). During the appeals process, Aetna consistently communicated the progress of independent reviews by Dr. Rea and Dr. Nowell to Plaintiff, his physician's, and his employer. (*See* Doc. 46-2 at 106, 155-57, 337, 341-44; Doc. 46-3 at 1.) The record further establishes Aetna either disclosed the doctors' reports in full to Plaintiff's physician or, except for Dr. Fineman, attempted to contact them personally. (*See e.g.,* Doc. 46-2 at 151-

58 (Dr. Nowell report faxed to Dr. Nelson), 163-64 (Dr. Rea call with Mr. Kuhlman), 221-22 (Dr. Nowell call with Dr. Kilgarriff), 222 (Dr. Nowell's unanswered call to Dr. Nelson).) Yet, Aetna failed to disclose those reports to Plaintiff and explain what was necessary to perfect his appeal "in a manner calculated to be understood." 29 C.F.R. § 2560.503-1(g)(1).

**vi. Duty to Investigate**

The question of whether the information Aetna possessed triggered a duty to further investigate or request additional information from Plaintiff remains. A few facts weigh in Plaintiffs favor. Drs. Kilgarriff and Fineman both concluded Plaintiff was unable to work. At a minimum, this corroborated Plaintiff's consistent reports to doctors of various specialties over the course of a year reinforces the veracity of his claims. As with Aetna's failure to communicate provide Plaintiff specific feedback to perfect his claim or explain its deficiencies, these claims were largely discredited or ignored. Accordingly, the Court finds an additional procedural violation in Aetna's failure to investigate the claim—specifically the reports of Dr. Kilgarriff and Dr. Fineman—further.

## IV.   CONCLUSION

The Court concludes that remand is appropriate here. A district court errs when it fails to give a plaintiff a "fair chance to present evidence on [a] point." *Saffon*, 522 F.3d at 871. Further, 29 C.F.R. § 2560.503-1(g)(1)(iii) provides that an ERISA plan administrator is required to provide, "in a manner calculated to be understood by the claimant," "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *Id; see also* 29 U.S.C. § 1133.[32] *Montour v. Hartford Life & Acc. Ins. Co.* is instructive here. 588 F.3d 623 (9th Cir. 2009). Like the Plan here, the policy at issue in

---

[32] In the Ninth Circuit, "the usual remedy for violation of [§] 1133 is to remand to the plan administrator so the claimant gets the benefit of a full and fair review." *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1035 (9th Cir. 2006) (internal quotation omitted); *see also Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 157-58 (5th Cir. 2009); *Shelby County Health Care Corp. v. Majestic Star Casino, LLC Group Health Ben. Plan*, 581 F.3d 355, 373 (6th Cir. 2009); *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008); *Gagliano v. Reliance Std. Life Ins. Co.* 547 F.3d 230, 240 (4th Cir. 2008); *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002).

*Montour* requires a claimant to submit proof of disability in the form of "pertinent documents and information necessary to facilitate a disability determination." 588 F.3d at 636. *Montour* went on to hold that, regardless of a claimant's burden, when working with an apparently deficient administrative record ERISA requires plan administrators "to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing the missing information." *Id.* (citing 29 C.F.R. § 2560.503-1(f)(3)-(4), (g)(1)(iii) and *Saffon*, 522 F.3d at 870). Here, a "full and fair review" of the administrative record should have placed Aetna on notice that records from Plaintiff's August 29, 2016 appointment with Dr. Fineman were omitted. Dr. Fineman's notes from a later appointment were included in the record and reviewed by both Dr. Nowell, (Doc. 46-2 at 131-34), and Dr. Rea, (Doc. 46-2 at 135-38). (*See also* Doc. 46-3 at 2-3.) ERISA requires Aetna to clarify its request for "objective clinical examination." Treatment for migraines and depression often depends on subjective evidence because symptoms largely evade typical clinical tests that produce objective measurements. Accordingly, to ensure a full and fair review of Plaintiff's claims, the Court remands to Aetna to review the excluded medical records, allow Plaintiff to seek psychological or functional testing as directed by Aetna, consider the aggregate effect of his claimed conditions, and redress any further procedural irregularities identified by this Order.

Plaintiff additionally requests his Social Security Administration disability decision ("SSA") be included in any future administrator review.[33] The SSA awarded Plaintiff disability benefits on September 5, 2017, determining Plaintiff disabled as of January 6, 2016—the same date of his claimed disability in the instant LTD dispute. (Doc. 71-4 at 2-5, "SSA Decision Letter".) Although the SSA did not render its decision until after the completion of the administrative record relevant to Plaintiff's LTD claim, Plaintiff's SSA and LTD claims share identical review periods. That is, the SSA decision is based on review of Plaintiff's condition from January 6, 2016 to June 6, 2016—the time period Aetna first approved STD benefits and later determined did not support a LTD award.

---

[33] Plaintiff previously authorized release to the SSA any information related to his disability claims with Aetna. (Doc. 46-2 at 239.)

"While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process.   In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence." *Montour*, 588 F.3d at 635. Although clearly, Aetna did not abuse its discretion by failing to consider a SSA decision that had not yet been rendered, Aetna should not now, when reconsidering the record due to a previous omission and procedural irregularities, ignore a conflicting SSA determination.[34]

Accordingly,

**IT IS ORDERED** GRANTING in part Plaintiff's Opening Brief and Motion for Summary Judgment and Motion to Supplement the Record, (Doc. 73), as to Plaintiff's Motion to Supplement the Record.

**IT IS FURTHER ORDERED** REMANDING the case to Aetna for  further consideration of the evidence consistent with this decision.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action and enter judgment accordingly.

Dated this 5th day of March, 2020.

Honorable Susan M. Brnovich
United States District Judge

---

[34] This is particularly merited where, as here, the medical conditions at issue rely in large part on a patient's self-reported symptoms. *See Salomaa*, 642 F.3d at 677.